**Reversed, Rendered, and Opinion Filed March 26, 2024**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-22-01358-CV

## DALLAS COUNTY HOSPITAL DISTRICT D/B/A PARKLAND HEALTH AND HOSPITAL SYSTEM, Appellant
## V.
## MICHAEL BALLEW, Appellee

**On Appeal from the County Court at Law No. 1**
**Dallas County, Texas**
**Trial Court Cause No. CC-20-04852-A**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Reichek, and Breedlove
Opinion by Justice Partida-Kipness

Appellee Michael Ballew sued appellant Dallas County Hospital District d/b/a

Parkland Health and Hospital System (Parkland) for disability discrimination and

retaliation. Parkland filed a plea to the jurisdiction, which the trial court denied. In

this interlocutory appeal, Parkland argues the trial court's order is erroneous. *See*

TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (allowing appeal from interlocutory

order denying plea to the jurisdiction by governmental unit). We reverse the trial

court's November 30, 2022 Order Denying Defendant's Plea to the Jurisdiction and

render judgment dismissing Ballew's claims against Parkland for lack of subject-matter jurisdiction.

## BACKGROUND

This proceeding arises from the 2019 termination of Ballew's employment, which he contends was the result of disability discrimination. Ballew began working at Parkland in 2001 as the Accounts Receivable Audit Supervisor. By 2008, he had been promoted to the position of Director of Patient Financial Services (PFS Director). At that time, Ballew was one of three directors of patient financial services, each with different functional responsibilities. The PFS Directors report directly to the Senior Vice President (SVP) of Revenue Cycle, who in turn reports to the Chief Financial Officer (CFO). Ballew was the PFS Director over "billing and collections for third parties and patients, and customer relations related to" those activities. According to Ballew, from June 2018 forward his responsibilities included "collections, customer service, cash posting, refunds, cashiers, bank reconciliation, reporting department, insurance update team, and scanning team." Between 2015 and 2017, Ballew reported to Rhonda Miller, the SVP of Revenue Cycle.

## I.      2016 Integrity Line Complaints

In 2016, employees filed eleven complaints against Miller and Ballew (the Integrity Line Complaints). Employees accused Miller and Ballew of: (1) displaying favoritism and poor leadership; (2) retaliating against employees; and (3) engaging in questionable billing and collection practices. Parkland's human resources

department, which is called the Officer of Talent Management (OTM), investigated the Integrity Line Complaints. Art Ferrell, Parkland's Director of Employee Relations at the time, initially recommended Miller and Ballew be terminated. But after discussions with senior leadership, the decision was made to administer a final disciplinary action on Ballew rather than terminate him because "the general consensus" was that Miller's "domineering style" may have impacted Ballew. In April 2017, Parkland terminated Miller. However, Ballew petitioned Parkland's President and Chief Executive Officer, Dr. Frederick Cerise, and he rescinded the progressive discipline for Ballew.

## II.    November 6, 2017 – Miller Replaced by Gerry Baker

Between May 2017 and November 2017, Miller's position remained vacant as Parkland searched for a new CFO. In August 2017, Parkland hired Rick Humphrey as CFO. On November 6, 2017, Humphrey hired Gerry Baker as SVP of Revenue Cycle to replace Miller. According to Baker, he was hired to improve Parkland's revenue cycle management. Baker was also tasked with completing 2017 performance reviews for his direct reports, including Ballew. Those reviews covered each employee's performance between October 1, 2016, and September 30, 2017, which was prior to Baker joining Parkland. Because he did not have firsthand knowledge of the employees' performance during that period, he largely adopted Miller's evaluation and ratings.

Ballew received his 2017 performance review on December 19, 2017. He received an overall rating of "Solid Contribution," which was consistent with his 2013 and 2015 reviews in which he also received an overall rating of "Solid Contribution." Baker included the following comment on the review:

> Overall, Michael has done a very good job managing the resources that he has had available to him. Focus areas for the upcoming year should be 1) developing staff[,] 2) updating policy and procedure documents so that they are relevant to how business is done today[,] 3) further improvement in key performance metrics (e.g., billed claims and DNB)[, and] 4) development of a formal Denials Management Program[.]

### III.  Ballew's June 2018 Hospitalization

In June 2018, Ballew experienced symptoms of hypopnea, a severe arterial obstruction. Ballew maintains he told Baker about his condition on June 30, 2018, before beginning treatment at Parkland. Baker testified he did not know specifically why Baker was hospitalized in June 2018. Ballew took paid time off (PTO) in June and July 2018 to undergo treatment. According to Baker, Ballew did not seek FMLA[1] leave for that treatment and did not request an accommodation of any kind or notify Parkland that he allegedly had a disability. Ballew also did not notify Baker that his tasks were not complete due to taking leave.

### IV.  Ballew's 2018 Performance Review

Ballew's 2018 performance review covered the period between October 1, 2017, and September 30, 2018. Ballew received the review in December 2018. Baker

---

[1] FAMILY MEDICAL LEAVE ACT OF 1993, 29 U.S.C. § 2601, et seq. (1993).

gave Ballew an overall rating of "Needs Improvement." The performance review addressed Ballew's completion of performance goals assigned to him for the review period and his leadership competencies. The three performance goals included in the 2018 review were:

- "Implement 2 process improvement initiative that originate from line staff through a new initiative to be developed to foster positive exchanging of ideas between leadership and staff."

- "Implement quarterly huddle meetings to share organization updates and solicit new and innovative ideas to opportunities from all levels of the departments."

- "Develop job descriptions and retain staff in areas of span of control--Denials Unit, Collections, Customer Service."

Baker rated Ballew as "Needs Improvement" on each goal based on Ballew's implementation of one or fewer initiatives, implementation of three or less documented huddle meetings, and developing 75% of job descriptions and completing 75% of retraining. Baker made the following comments concerning his review of the performance goals:

> Michael has several areas that need improvement as he lacks follow through and being responsive to internal and external requests for information or requests. One of his primary goals this year was to create a Denials Unit. It took many months to recruit and hire staff and deadlines were not met. He also has not followed through on engaging employees and being responsive to their development needs.

The performance review also rated Ballew on three leadership competencies: (1) driving continuous improvement, (2) developing talent, and (3) driving performance excellence. Baker rated Ballew as "Solid Contribution" for driving continuous

improvement and "Needs Improvement" for the other competencies. He commented that Ballew "has failed to drive performance excellence and motivate his staff to achieve all that they can. He has not been able to resolve most conflicts when presented to him."

## V.     The 2019 FMLA Leave

In March 2019, Ballew needed surgery. Baker encouraged Ballew to seek FMLA leave. Ballew applied for FMLA leave and was granted FMLA leave from March 20, 2019, through May 5, 2019 (the 2019 FMLA Leave). According to Baker, Ballew did not request any accommodation or notify Baker that he would be unable to complete certain tasks due to the 2019 FMLA Leave. Baker recalls that, before Ballew took the 2019 FMLA Leave, he "repeatedly" told Baker in their "weekly one-on-one meetings that his projects were on track," and Ballew did not notify Baker "of any issues or complications that would prevent the completion of his projects."

## VI.     Baker's Discoveries During the 2019 FMLA Leave

Baker covered Ballew's responsibilities during the 2019 FMLA Leave. Baker testified he was "appalled" by what he discovered "and the state of affairs on projects [he] assigned to Ballew." Between November 2017 and April 2018, Baker had assigned Ballew the following projects:

1.     Cancel a vendor contract with NThrive because Parkland had contracted with a replacement vendor;

2. Develop a Denials Management Group dedicated to appealing insurance claim denials and hire six full-time employees to staff the group (the DMG Project);

3. Establish a procedure that would allow Parkland to send out invoices to self-pay patients (the Self-Pay Accounts Project);

4. Improve the abandonment rate for calls to the PFS call center; and

5. Improve his responsiveness to his team, customers, and other departments.

According to Baker, Ballew did not successfully complete any of the assigned tasks. Baker testified those failures detrimentally impacted his efforts to improve Parkland's revenue cycle management and cost Parkland millions of dollars in lost or delayed revenue.

## A. Self-Pay Accounts Project

Ballew's handling of the Self-Pay Accounts Project was central to Parkland's decision to terminate Ballew. When Baker started at Parkland, the billing of and collection from self-pay patients was outsourced to BCA, a third-party vendor. BCA was a "soft collection"[2] agency, as opposed to a "bad–debt" agency or collector. BCA earned its fee by delivering a first round of statements to Parkland patients and then collecting payments from those patients. Baker created the Self-Pay Accounts

---

[2] Soft collections "refer to the process of collecting payment from patients before their medical bills become delinquent. This collection strategy involves sending reminders and statements to patients who have not paid their bills on time. Soft collections are less aggressive than hard collections, and they are often used to prevent the need for legal action or other aggressive collection strategies." https://myrcmgroup.com/articles/what-is-the-difference-between-hard-and-soft-collections (last visited March 26, 2024).

Project to reduce the amount of fees paid to third-party vendors like BCA to collect from self-pay patients.

According to Baker, most self-pay patients paid their bills within the first two months of billing. He concluded the outsourcing fees could be reduced if Parkland, rather than BCA, generated and sent out the first statement to patients when medical services were complete and sent the second statement thirty days later if payment was not received. Parkland would save money under this plan because paying BCA for collections assistance would be limited to invoices that went unpaid beyond fifty-five days, when BCA would take over collection efforts. Accounts would be sent to a "bad-debt agency" if they remained unpaid more than 180 days.

Baker delegated the Self-Pay Accounts Project to Ballew in April 2018 because Parkland's contract with BCA was set to expire in June 2018. When the contract with BCA expired, MiraMed[3] became the new third-party vendor for self-pay collections. Under the new process, Parkland would refer past-due accounts to MiraMed at the fifty-five-day mark. MiraMed would then send statements to and try to collect payment from those self-pay patients whose account remained unpaid from day 56 until day 180. If the account remained unpaid for 180 days, MiraMed would send the account back to Parkland, and then Parkland would send the account to a "bad-debt agency."

---

[3] MiraMed, like BCA, is a "soft-collection" agency.

Baker expected Ballew to have the Self-Pay Account Project completed and the process in place by July 2018, so there would be no disruption in operations. Because Parkland did not have the in-house ability to print and mail statements, Parkland planned to utilize a third-party vendor, Exalt, to print and mail the first two statements. During the Fall of 2018, Ballew coordinated with Parkland's IT department and Exalt to test the new process. During the testing period, Exalt was allowed to print and mail no more than 500 statements per day. The cap was in place to test Exalt's capacity and to make sure the data was flowing correctly from Parkland to Exalt. But the cap was supposed to be lifted once testing was complete and Exalt's capacity confirmed. The plan was for Exalt to print and mail 5,000 statements per day.

But in April 2019, while Ballew was on FMLA leave, Baker discovered the Self-Pay Accounts Project was never completed. Baker was informed that patients who had never received a statement from Parkland were complaining about being turned in to bad-debt collectors. When he began investigating those specific complaints, he discovered the 500-statement cap had not been removed "for many, many, many months" and no statements had gone out to thousands of patients. By May 3, 2019, more than 11,000 self-pay patients had never been sent an initial statement. Baker determined the cause was Ballew's unilateral decision to keep the 500-statement cap in place even though Exalt had the capacity to send out 5,000 statements per day. Ballew's actions and inactions affected between $150 million

–9–

and $180 million of accounts receivable by May 2019, and Baker estimated Parkland would incur additional, unbudgeted expenses to outsource accounts receivable "to prevent further delays in efforts to collect some of the cash." Baker also explained how Ballew's actions negatively impacted patient cash collections:

> Those patients who would normally pay their balance or a portion after receiving two statements, have not paid Parkland. On average we collect approximately 1% of self-pay from patients, which equates to $1.5-$1.8 million per month in cash Parkland could have received.

Baker estimated Ballew's actions resulted in the loss of or delay in receiving between $6 million and $7.2 million during the first four months of 2019.

Baker also discovered Ballew tried to conceal his failure to complete the project by sending thousands of self-pay account customers to a bad-debt collector without ever sending the patients a first or second statement. Had he not done so, the reported amount of Parkland's receivable on self-pay accounts would have ballooned and alerted Baker the project had not been completed. Ballew evaded detection because sending thousands of customers straight to bad-debt collection made the amount of outstanding accounts receivable appear to not be increasing. But the number of calls to the PFS call center increased because of calls from "angry patients who were being hounded by debt collectors." Ballew's actions violated Parkland's policies and placed added stress on the PFS call center.

## B. Denial Management Group Project (DMG Project)

Ballew's failure to complete the DMG Project also caused Parkland to lose a valuable revenue stream. Parkland, like many hospital systems, relies on

reimbursement from insurers to fund patient care. But the insurance claims process is complicated and often results in insurers denying claims for correctable reasons, such as typographical errors and incorrect billing codes. Baker charged Ballew with developing and establishing a group (the Denials Management Group) to amass denied claims, understand and address the reasons for denial, and then appeal those claims with insurers as necessary with the goal of obtaining payment. To complete the DMG Project, Ballew needed to hire the necessary staff to form the group, create training material and templates for the group to use when challenging the insurance denials, and create staff workflows and staff training documents. Although Ballew told Baker the Denials Management Group had been formed, Baker discovered during the 2019 FMLA Leave that Ballew had not hired or trained the appropriate staff to form the group.

By the end of March 2019, the amount of denials had grown to $93 million. At that time, only one full-time employee was handling the denials and could not keep up with the growing number of denials. Ballew allowed that employee to write-off old balances instead of trying to resolve the denials and collect the revenue owed to Parkland. By the end of April 2019, Ballew's failure to form the Denials Management Group forced Parkland to write off at least $23 million dollars because the time to appeal those denials had expired. Baker estimated Parkland could lose an additional $10 to $15 million dollars as more denials aged out of the appeal window.

## C. The remaining assignments

According to Baker, Ballew also failed to fulfill the remaining assignments. Ballew's failure to timely cancel the NThrive contract cost Parkland $120,000. As for addressing the abandonment rate for calls, Ballew took no steps to improve the abandonment rate. Call abandonment occurs when a caller hangs up after being placed on hold. Baker testified Ballew should have addressed this issue by (1) coaching and training his team to be more efficient, (2) engaging in progressive discipline, where necessary, and (3) requesting additional full-time employees. Ballew took none of those steps and, instead, blamed his employees and stated he could not get them to do a better job. Ballew also continued to be nonresponsive to his team, customers, and others. He would not return calls, respond to emails, or answer his team's questions. This resulted in patient questions remaining unanswered and required Baker to intervene on multiple occasions.

## VII. Parkland's Investigation

On May 3, 2019, Baker wrote a memorandum outlining Ballew's performance issues (the May 3, 2019 Memo). In it, Baker described the discoveries he made regarding the Self-Pay Accounts Project, the DMG Project, and the NThrive cancellation. Baker stated Ballew's "behavior has likely cost Parkland approximately $40-50 million in recoverable revenue" and demonstrated Ballew's integrity and transparency were "lacking and extremely troubling." Baker

recommended an immediate investigation and indicated the results of that investigation would determine if he would recommend Ballew be terminated.

Ballew's 2019 FMLA Leave ended on May 5, 2019. On May 9, 2019, Parkland placed Ballew on administrative suspension with pay while it investigated the state of PFS and Baker's allegations. Baker testified the investigation complied with Parkland's standard operating procedures.

In his interrogatory responses, Ballew stated he first told Parkland he was "being treated unfairly because of his health condition" on May 9, 2019, when they suspended him:

> The complaint was made to Gary Baker and the human resource representative who was present. He also complained of discrimination and retaliation on his appeal to the persons involved in the appeal. Parkland retaliated against him by making false statements about him, by not conducting a fair investigation or appeal, and by terminating his employment.

Ballew presented three written statements to explain his actions between May 9, 2019, and June 10, 2019. In them, Ballew denied wrongdoing and challenged the accuracy of the May 3, 2019 memo.

For example, he insisted the cap on self-pay statements was necessary because the system was not ready for increased output. He also insisted it was Baker's "call" when to lift the cap. He also asserted that patient complaints about being sent to collections without receiving statements had been "known and ongoing since around August 2018." Ballew maintained Baker "reviewed and approved" the cap on statements and "was keenly aware" the cap would cause Parkland to "encounter

–13–

months of little to no placements." He blamed Baker's decision to change the self-pay methodology for "the lapse in bad debt placements." He also stated the Self-Pay Accounts Project could not be completed without hiring new full-time employees, and he blamed Baker and Miller for understaffing the PFS. According to Ballew, Parkland approved new hires in November 2018, but did not hire anyone until March 2019. He contended he was unable to participate in hiring and training because he was on FMLA leave when those events occurred. Ballew also denied being tasked with creating a denials work group and stated Baker told him not to create such a group. In his May 21, 2019 statement, Ballew described the suspension as "another step in a pattern of retaliation directly linked to [Ballew's] health issues."

Pamela Brooks, a member of Parkland's employee relations team, conducted the investigation. In June 2019, Baker sent a follow-up email to Brooks and Arthur Ferrell, the head of Parkland's employee relations team. In that email, Baker provided additional information concerning the situation and a recap of a meeting he had with Ballew at which he posed a series of questions for Ballew to answer. Baker noted he had "no confidence in Mr. Ballew's integrity" because Ballew "was not honest in his answers to questions today nor in his written statements from May 9th and May 21st." Baker also suggested Ballew lacked compassion and did not have the ability to uphold Parkland's values because he turned patient accounts over to debt collectors as bad debts without first sending them a statement or following Parkland policy guidelines. Baker recommended Parkland terminate Ballew.

After completing the investigation, Brooks provided an investigation report to Farrell in which she recommended Ballew be terminated. Farrell reviewed the investigation report and approved Brooks' recommendation to terminate Ballew. Farrell testified the issues with Ballew were "of gross misconduct," so the lack of prior progressive discipline was not a factor. Because the misconduct was considered so egregious, "the first time it occurred could indeed lead to termination of employment, which was the case here."

Parkland terminated Ballew's employment. In a June 21, 2019 termination letter, Brooks informed Ballew of the outcome of the investigation:

> The investigation findings indicate that you have exhibited behavior that does not align with Parkland values and failed to meet the performance standards expected of a leader. As such, your employment is terminated effective June 20, 2019 for not adhering to the Standards of Service Excellence (OTM Procedure 6000-210) required of Parkland employees, and also failing to demonstrate the values of Compassion, Integrity, Respect, and Stewardship. The Progressive Discipline Report documenting the reasons for your termination is attached.

The reasons for progressive discipline described in the report mirrored Baker's allegations. Parkland's internal termination statement listed the following reasons for the termination:

> **Lack of integrity and not carrying out job responsibilities:** Mr. Ballew was responsible for establishing a process to hold self-pay AR in-house for 55 days and to send (2) statements to patients and then outsource the AR to an Early Out vendor.

> **Honesty, Personal Accountability:** Mr. Ballew was tasked with for[m]ing a denials unit within the department in early 2018. Throughout the entire performance year Mr. Ballew and Mr. Baker repeatedly discussed his progress. By the time annual reviews were

–15–

conducted, Mr. Ballew still had not accomplished this task and this was highlighted as a deficiency in this FY 2018 annual review. Mr. Ballew repeatedly told his leader that he had established the work.

Farrell and Brooks testified the reasons for Ballew's termination were the poor performance issues and concerns with Ballew's integrity and honesty as set out in Baker's May 3, 2019 memo and follow-up email and as summarized in Brooks' investigative findings.

Ballew appealed the termination internally, and Parkland upheld the termination. On December 9, 2019, Ballew filed a charge of discrimination with the EEOC alleging disability discrimination and retaliation. In the charge, Ballew asserted Parkland discriminated against him because he had a serious blood vessel circulation condition. He also claimed Parkland's reason for terminating him—performance—was not true because his "performance was not an issue." After exhausting his administrative remedies and obtaining a right to sue letter from the EEOC, Ballew filed the underlying lawsuit.

## VIII. Parkland's Plea to the Jurisdiction

Parkland filed a plea to the jurisdiction in the trial court. In support, Parkland submitted nearly 600 pages of evidence, including Baker's affidavit, documents related to Baker's concerns and the investigation, Ballew's 2013, 2015, 2017, and 2018 performance reviews, Ballew's request for FMLA leave and the approval of that request, Ballew's investigation responses, the termination notice and accompanying documentation, Ballew's EEOC charge, and the deposition

transcripts of Baker, Brooks, Ferrell, Humphrey, Ballew, and three other witnesses employed at Parkland at the time of the investigation. Ballew filed a written response to Parkland's Plea to the Jurisdiction. In support of his response, Ballew submitted excerpts from his deposition, two personal declarations, his medical record excerpts and 2017 performance review, the deposition of Humphrey, and a declaration from former Parkland employee Sheri Kowalski. The trial court held a hearing on the plea to the jurisdiction on November 21, 2022, and denied the plea on November 30, 2022. This interlocutory appeal followed.

## STANDARD OF REVIEW

Governmental entities, including hospital districts, are immune from suit unless the state consents. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009) (hospital districts have governmental immunity). "The TCHRA[4] waives immunity, but only when the plaintiff states a claim for conduct that actually violates the statute." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770–71 (Tex. 2018) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012)).

Immunity from suit may be asserted through a plea to the jurisdiction and may challenge the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights I.S.D.*, 544 S.W.3d at 770–71. When a jurisdictional plea challenges the pleadings,

---

[4] Texas Commission on Human Rights Act (TCHRA).

we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction. *Id.* (citing *Miranda*, 133 S.W.3d at 225–26). If, however, the plea challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim. *Id.*

Here, Parkland's jurisdictional plea challenged the existence of jurisdictional facts with supporting evidence. The standard of review, therefore, mirrors that of a traditional summary judgment:

> [I]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction.

*Id.* (citing *Miranda*, 133 S.W.3d at 221). In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 811–12, 822–23, 827 (Tex. 2005)). We cannot, however, disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Id.* at 771 (citing 42 U.S.C. § 2000e–2(a)(1)).

## APPLICABLE LAW

The Texas Commission on Human Rights Act (TCHRA) prohibits an employer from committing an "unlawful employment practice" against an employee "because of" the employee's "race, color, disability, religion, sex, national origin, or age." TEX. LAB. CODE § 21.051. Under the TCHRA, an employer commits an unlawful employment practice if the employer discharges an individual "because of" a disability. *Id.* § 21.051(1). Generally, an employer commits an unlawful practice "because of" an employee's disability if the employee's disability "was a motivating factor for an employment practice, even if other factors also motivated the practice, . . ." *Id.* § 21.125(a).

To establish unlawful discrimination, a plaintiff may rely on either direct or circumstantial evidence. *Id.* at 782. When, as here, there is no direct evidence of discrimination or retaliation, we follow the burden-shifting framework the United States Supreme Court established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Alamo Heights*, 544 S.W.3d at 764, 782. Under this framework, (1) the plaintiff must first create a presumption of illegal discrimination by establishing a prima facie case, (2) the defendant must then rebut that presumption by establishing a legitimate, nondiscriminatory reason for the employment action, and (3) the plaintiff must then overcome the rebuttal evidence by establishing the defendant's stated reason is a mere pretext. *Id.* at 782. The burden of persuasion showing the existence of subject matter jurisdiction always lies with the employee.

*Id.*; *Flores v. Tex. Dep't of Crim. Just.*, 634 S.W.3d 440, 451 (Tex. App.—El Paso 2021, no pet.) (*Flores II*).

## ANALYSIS

In two issues, Parkland contends the plea to the jurisdiction should have been granted because (1) Parkland's reasons for terminating Ballew were undisputed and legitimate and nondiscriminatory, and (2) Ballew failed to make a prima facie case of discrimination, retaliation, or hostile work environment. Parkland maintains it is unnecessary to determine if Ballew presented a prima facie case for each alleged TCHRA violation because Ballew presented no evidence Parkland's legitimate, nondiscriminatory reasons for terminating Ballew's employment were false and pretextual.

We agree Parkland's arguments regarding Ballew's disability discrimination and retaliation claims may be decided without determining if Ballew established a prima facie case on each of those claims. However, it is unclear whether the *McDonnell Douglas* framework applies to a hostile work environment claim in this context. We will, therefore, analyze that claim outside of the *McDonnell Douglas* framework.

## I.    Disability Discrimination and Retaliation Claims

There is no direct evidence of disability discrimination or retaliatory conduct in this case. The burden-shifting framework set out in *McDonnell Douglas*, therefore, applies to Ballew's claims for discrimination and retaliation. *See Alamo*

*Heights*, 544 S.W.3d at 782 (noting the *McDonnel Douglas* burden-shifting steps applied in discrimination claims also apply to retaliation claims). We assume without deciding that Ballew established a prima facie case of discrimination and retaliation and, as a result, a rebuttable presumption of discrimination and retaliation arose. Under *McDonnell Douglas*, the burden then shifts to Parkland to rebut the presumption by producing evidence of a legitimate, nondiscriminatory reason for the termination of Ballew's employment. *Id.*

### A. Legitimate, nondiscriminatory reasons for terminating Ballew

Parkland contends it "proffered ample legitimate and nondiscriminatory reasons for firing Ballew." Specifically, Parkland maintains its evidence showed Ballew engaged in conduct requiring him to be terminated. That conduct included failing to execute Parkland's objectives, acting callously toward Parkland's patients, and lacking integrity, honesty, and personal accountability in his job performance. We agree.

Parkland presented declarations, deposition transcripts, and supporting evidence showing the conduct for which it decided to terminate Ballew. That evidence is discussed at length above and will not be repeated here. However, included in that evidence was testimony from Farrell and Brooks confirming that the reasons for Ballew's termination were the poor performance issues and concerns with Ballew's integrity and honesty as set out in Baker's May 3, 2019 memo and follow-up email and summarized in Brooks' investigative findings. Brooks also

testified the performance issues that lead to Ballew's termination occurred prior to the 2019 FMLA leave. Those issues were not discovered until he was on leave, however, because Ballew did not communicate any problems with implementing the projects to Baker or escalate any issues to Baker for resolution.

Under this record, we conclude Parkland's evidence established that its stated reasons for terminating Ballew's employment were legitimate and non-discriminatory. By doing so, Parkland rebutted any presumptions of discrimination and retaliation. *See Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000) (finding "unsatisfactory performance as a manager" sufficient to meet burden of production); *See also Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002) ("Poor work performance is a legitimate, non-discriminatory reason for discharge"); *Gold v. Exxon Corp.*, 960 S.W.2d 378, 383 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (loss of confidence caused by an employee's job performance is a legitimate nondiscriminatory reason). The burden then shifted back to Ballew to show Parkland's stated reasons were false and a pretext for discrimination.

## B.     No evidence of pretext

To raise a fact issue on the pretext element of a discrimination claim, the employee must present evidence proving the reasons stated by the employer were not its true reasons, but were a pretext for discrimination, or the reasons were not credible. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000);

–22–

*Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802, 814 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (quoting *Elgaghil v. Tarrant Cnty. Junior Coll.*, 45 S.W.3d 133, 139 (Tex. App.—Fort Worth 2000, pet. denied)); *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 655 (Tex. App.—Dallas 2012, no pet.). However, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148. "The issue at the pretext stage is not whether the employer made an erroneous decision; it is whether the decision, even if incorrect, was the real reason for the termination." *Jespersen*, 390 S.W.3d at 655 (first citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002), and then citing *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)). The employer "is entitled to be unreasonable so long as it does not act with discriminatory animus." *Sandstad*, 309 F.3d at 899.

"If the employee intends to show the explanation is so unreasonable it must be pretextual, it is the employee's burden to proffer evidence creating a fact issue regarding reasonableness." *Jespersen*, 390 S.W.3d at 655 (citing *Sandstad*, 309 F.3d at 899). "An employee's subjective belief of discrimination or retaliation, no matter how genuine, cannot serve as the basis for judicial relief." *McCoy v. Tex.*

*Instruments, Inc.*, 183 S.W.3d 548, 555 (Tex. App.—Dallas 2006, no pet.); *Jespersen*, 390 S.W.3d at 655–56 ("An employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is insufficient to survive a summary judgment motion.").

In the trial court, Ballew argued his performance was "not an issue," and he was a "good worker" with "high" performance. He argued Parkland's performance-based reasons for terminating his employment "were false and a pretext to cover up discrimination and retaliation." Ballew denied all the allegations against him, and maintained any problems were due to lack of personnel or were caused by other managers or other departments. For example, Ballew stated the NThrive cancellation issue was caused by the legal department's failure to timely cancel the contract. Similarly, he insisted Baker's allegations that Ballew did not form the Denial Management Group and did not complete the Self-Pay Accounts Project were false. Ballew maintained Baker was the problem, not him.

The evidence submitted by Ballew to support his arguments, however, consisted only of his own, conclusory statements in two personal declarations and similar deposition testimony. Ballew presented no documentary support for those allegations. Moreover, Ballew does not dispute Parkland's findings that the Self-Pay Accounts Project was not completed, the Denials Management Group was not formed, or the NThrive contract was not timely cancelled. Similarly, he does not dispute that he left the 500-statement cap in place past the testing period or that he

sent thousands of patient accounts to bad-debt collection without first sending statements to those patients and seeking payment. Instead, he blames other Parkland employees, including Baker, for those actions and their consequences, and insists he acted in accordance with Baker's directives.

Ballew's evidence, at most, shows his subjective disagreement with Parkland's investigative findings and his subjective beliefs that he was a high performing employee who acted appropriately and per the direction of management. His beliefs, standing alone, are insufficient to show pretext. *See Tex. Dep't of Aging & Disability Servs. v. Lagunas*, 618 S.W.3d 845, 853 (Tex. App.—El Paso 2020, no pet.) (a plaintiff must do more than make a "bare assertion" or merely express his "subjective belief" that the defendant's reasons for its employment decision were both false and pretextual) (internal citation omitted). Other than stating Parkland's accusations are false, Ballew did not attempt to refute Parkland's evidence that he performed poorly and violated Parkland protocols. He provided no evidence to show he performed the assignments in a timely and appropriate matter, to prove his actions were all at the direction of Baker or other employees, or to disprove Baker's findings and the timing of those findings. He, therefore, failed to rebut Parkland's reasons for terminating him and failed to create a genuine issue of material fact on whether the poor-performance reason given by Parkland was mere pretext for discrimination. *See, e.g., Ajao v. Bed Bath & Beyond, Inc.*, 265 Fed. Appx. 258, 263 (5th Cir. 2008) (in failing to provide evidence of his own good job performance, plaintiff failed to

–25–

create genuine issue of material fact on whether poor performance reason given by employer was mere pretext for discrimination).

Moreover, an employee does not raise a fact issue on the question of pretext merely because he disagrees with the employer's assessment of his performance; rather, the issue is whether the employer's perception of his performance, accurate or not, was the real reason for his termination. *See Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 438–39 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (employee's affidavit testimony denying employer's allegation of poor job performance and offering an explanation for the cited performance issues and work rule violations did not raise a fact issue as to pretext); *see also McCoy*, 183 S.W.3d at 555–56 (noting that absent discriminatory motive, disagreement about job performance is not actionable and that even incorrect belief that employee's performance is inadequate constitutes legitimate, non-discriminatory reason for termination). Similarly, an employee's denials of bad performance and his subjective belief that his employer has given a false reason for its employment decision does not raise a fact issue as to pretext. *Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993) ("[plaintiff] must, instead, produce evidence demonstrating that [the City's decisionmakers] did not in good faith believe the allegations, but relied on them in a bad faith pretext to discriminate against him *on the basis of his age*." (emphasis in original)); *Little v. Tex. Dep't of Crim. Just.*, 177 S.W.3d 624, 632 (Tex. App.—Houston [1st Dist.] 2014) ("[T]he United States Supreme Court has made it

clear that it is not sufficient merely to show that the employer's reasons are false or not credible; the plaintiff must prove that the employer discriminated intentionally.") (citing *Reeves*, 530 U.S. at 146–47).

Parkland cited many job-related reasons for losing confidence in Ballew and for terminating him. Those reasons were based on conduct that occurred before Ballew took the 2019 FMLA Leave and before Baker was aware Ballew had a disability due to his medical condition. Further, although Parkland did not suspend or terminate Ballew until he returned from the 2019 FMLA Leave, temporal proximity alone cannot rebut an employer's legitimate, nondiscriminatory reason for the employment action. *Stingley v. Den–Mar Inc.*, 347 F. App'x 14, 20 (5th Cir. 2009) (per curiam); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004) (affirming grant of summary judgment in favor of employer where plaintiff attempted to rebut the employer's legitimate, nondiscriminatory reason for a termination with only timing allegations) *Reed v. Cook Children's Med. Ctr., Inc.*, No. 02-13-00405-CV, 2014 WL 2462778, at *8 (Tex. App.—Fort Worth May 29, 2014, no pet.) (mem. op.) (temporal proximity argument alone is insufficient to create a genuine issue as to pretext where employer provided a nondiscriminatory reason for employment action). Here, the evidence shows the timing was the result of Baker discovering the performance issues while covering Ballew's job when he was on leave.

Ballew presented no competent evidence to dispute Parkland's evidence or its legitimate, nondiscriminatory reasons for his termination. Rather, he relied solely on his own, conclusory testimony to insist Baker knew the Self-Pay Accounts Project was not completed, chose to keep the 500-statement cap in place despite the consequences, and did not task Ballew with implementing a Denial Management Group. That testimony is insufficient to raise a fact question as to pretext. *See Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 231–32 (Tex. 2004) ("Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'") (quoting TEX. R. EVID. 401); *see also Cas. Underwriters v. Rhone*, 132 S.W.2d 97, 99 (Tex. 1939) (holding that a witness's statements were "but bare conclusions and therefore incompetent").

Ballew states in his brief that he is using evidence of "pattern and practice, or systemic discrimination, . . . as part of showing pretext. . . ." In support, he cites only conclusory statements from his declarations. Those statements include his allegation that he has personal knowledge of "Parkland's pattern and practice of discriminating against persons with disabilities," his assertion that disability discrimination "is widespread and well known at Parkland," and his claim that he witnessed disability discrimination against other Parkland employees. To the extent Ballew relies on this purported evidence of pattern or practice to show pretext, we conclude it does not raise a fact issue as to pretext. Ballew submitted no evidence to support his

allegations. Rather, they are simply his unsubstantiated opinions. Such testimony is insufficient to raise a fact question as to pretext. *See* TEX. R. EVID. 401; *see also Coastal Transp. Co.*, 136 S.W.3d at 231–32; *Rhone*, 132 S.W.2d at 99. Further, the pattern-or-practice evidence cited by Ballew refers to alleged conduct related to other Parkland employees and far in time from Ballew's termination. Those allegations do not raise a fact issue on the question of pretext.

Under this record, we conclude Ballew produced no competent evidence that Parkland's reasons for terminating him were false or a pretext for discrimination. Accordingly, the trial court erred by denying Parkland's plea to the jurisdiction as to Ballew's disability discrimination and retaliation claims. We sustain Parkland's issues as to those claims.

## II.    Hostile Work Environment Claim[5]

Ballew's pleadings below reference his contention that Parkland's actions against Ballew created a hostile work environment. It is unclear whether the *McDonnell Douglas* framework applies to a hostile work environment claim in a case alleging disability discrimination. *Compare Carpenter v. Haaland*, No. 19-CV-13208, 2021 WL 1198261, at *10 n.122 (E.D. La. Mar. 30, 2021) (concluding the

---

[5] Ballew's pleadings also reference his contention that Parkland engaged in a pattern or practice of discrimination. On appeal, Ballew confirmed he is not asserting a separate claim or alternative theory of pattern and practice discrimination. Rather, he contends evidence of pattern and practice is "part of showing pretext or the totality of circumstances to show discrimination." Ballew cannot rely on evidence of "pattern or practice," however, because that theory of recovery is available only to plaintiffs in a class action. *E.g.*, *Rogers v. Pearland ISD*, 827 F.3d 403, 408 (5th Cir. 2016) (confirming pattern-or-practice method of proving discrimination is unavailable in a private, non-class action).

–29–

*McDonnell Douglas* burden-shifting analysis does not apply to hostile work environment claims because an employer "may not offer a legitimate reason for creating such an environment."), *EEOC v. Bass Pro Outdoor World, LLC*, 35 F.Supp.3d 836 (S.D. Tex. July 30, 2014) (hostile work environment claims are not proven using *McDonnell Douglas* scheme), and *Razavi v. Franklin Apartment Mgmt., Ltd.*, No. SA-21-CV-01093-JKP, 2022 WL 4545755, at *9–11 (W.D. Tex. Sept. 28, 2022) (applying traditional summary judgment burdens to hostile work environment claim), *with Hayatdavoudi v. Univ. of La. Sys. Bd. of Trs.*, 240 F.3d 1073 (5th Cir. 2000) (applying *McDonnell Douglas* framework to each alleged adverse employment action within plaintiff's hostile work environment claim).

Under the *McDonnell Douglas* framework, Parkland's plea to the jurisdiction should have been granted as to a hostile work environment claim for the same reasons Ballew's discrimination and retaliation claims should be dismissed; Ballew failed to raise a fact issue as to pretext. The result is the same if we apply general summary judgment standards because Ballew failed to present evidence of a prima facie case of a hostile work environment claim.

A hostile work environment claim entails ongoing harassment, based on the plaintiff's protected characteristic, so severe or pervasive it alters the conditions of employment and creates an abusive working environment. *Filardo v. Baylor Scott & White Health*, No. 05-21-01066-CV, 2023 WL 5317870, at *11 (Tex. App.—Dallas Aug. 18, 2023, no pet.) (mem. op.) (first citing *In re Parkland Health & Hosp.*

*Sys. Litig.*, No. 05-17-00670-CV, 2018 WL 2473852, at *8 (Tex. App.—Dallas June 4, 2018, no pet.) (mem. op.), and then citing *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 646 (Tex. App.—Houston [1st Dist.] 2015, no pet.)). The elements of a prima facie case of hostile work environment are (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on the protected characteristic; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Parkland*, 2018 WL 2473852, at *8; *Anderson*, 458 S.W.3d at 646. An employee complaining of harassment by a supervisor need only show the first four elements. *Parkland*, 2018 WL 2473852, at *8; *Anderson*, 458 S.W.3d at 646. We consider the totality of the circumstances when reviewing a hostile work environment claim, including: "the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance." *Donaldson*, 495 S.W.3d at 445.

In his pleadings below, Ballew included the following paragraph addressing the hostile work environment claim:

> Parkland discharged Mr. Ballew and discriminated in its treatment of him in connection with the terms, conditions, or privileges of employment because of a disability. Parkland's treatment of Mr. Ballew was severe and pervasive harassment that altered the terms and conditions of his employment by making his employment multiple

–31–

times harder than before he was diagnosed with his medical condition. The harassment included preventing Mr. Ballew's ability to make decisions within his job responsibility, ostracizing him, displaying a hostile attitude demeaning him in leadership meetings, creating unnecessary obstacles for Mr. Ballew's job, subverting his work by diverting needed information to other departments, and creating unnecessary problems with inconsistent direction and leadership, all in an intentional effort to place undue pressure and anxiety upon Mr. Ballew.

In response to Parkland's plea to the jurisdiction, Ballew stated the following regarding his hostile work environment claim:

> Mr. Baker's [sic] boss, who had the power to make hiring, firing, and promotional decisions, made continuous false statements and instructions, making impossible demands that were contrary to Parkland's instructions and then holding him accountable for the false narrative rather than the true instructions. (Ex. 1, P1. Appx. 1-18). It is hard to conceive of a more severe and pervasive environment short of physical assault. (Ex. 1, Pl. Appx. 1-18).

As evidence to establish a prima facie case, Ballew cited to the entirety of his eighteen-page declaration.

On appeal, Ballew asserts he belonged to a protected group because of his disability and again references Baker's allegedly "impossible demands" and "outrageous accusations" as the alleged harassing conduct:

> He was subjected to unwelcome harassment that included outrageous accusations of costing Parkland "tens of millions of dollars in lost revenue" and exposing a "lack of integrity, candor, and compassion." Appellant Brief p. 2, 8, 23. 4CR1069.[6] In addition to the outrageous accusations, Ballew suffered a false and unmerited reprimand, poor

---

[6] These citations are to allegations made in Parkland's brief at pages 2, 8, and 23, and statements by Baker in his declaration in support of the plea to the jurisdiction.

performance review, and write up, as well as an underserved suspension.

Baker's [sic] boss, who had the power to make hiring, firing, and promotional decisions, made continuous false statements and instructions, making impossible demands that were contrary to Parkland's instructions and then holding him accountable for the false narrative rather than the true instructions. CRSUPPL71[7]. It is hard to conceive of a more severe and pervasive environment short of physical assault. The harassment was all tied to the disability for which no remedy was given to stop or prevent the harassment. Ballew has established sufficient facts for a hostile work environment for damages suffered before the termination of his employment.

Ballew cites no authority to support his contention these allegations establish a prima facie case of hostile work environment claim. Parkland contends these arguments and evidence fail to establish a prima facie case because they do not mention harassment based on a disability and do not show an objectively or subjectively hostile environment. We agree.

The third and fourth elements of a hostile work environment claim require Ballew to show the harassment complained of was based on the protected characteristic and affected a term, condition, or privilege of employment. *Anderson*, 458 S.W.3d at 646. Ballew's pleadings of hostile work environment and his allegations and cited evidence in response to Parkland's plea and appeal do not reference his disability. Nor does Ballew assert or imply that Baker's alleged actions were because of Ballew's disability. Ballew, therefore, failed to present a prima facie case of the third element of a hostile work environment claim.

---

[7] This citation is to paragraph 148 of Ballew's declaration.

His proof also falls short on the fourth element. To satisfy the fourth element of a hostile environment claim, a plaintiff must show the workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to create a hostile or abusive working environment. *See Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 163 (5th Cir. 2007) (citations omitted); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 806 (Tex. 2010) (noting abusive environment is created "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult.'") (citation omitted). The work environment must be both objectively and subjectively offensive—one that a reasonable person would find hostile or abusive and one that the victim perceived to be so. *City of Hous. v. Fletcher*, 166 S.W.3d 479, 489 (Tex. App.—Eastland 2005, pet. denied); *Donaldson*, 495 S.W.3d at 445.

The conduct alleged by Ballew, even if true, does not rise to a level to support a hostile work environment claim because it either occurred when Ballew was on suspension and not present in the work environment (i.e, Baker's allegations against him during the investigation), or describes work assignments as "impossible demands" without discussion or proof as to how those assignments were offensive. Moreover, none of the alleged conduct involved comments or actions targeted at Ballew's disability, and the conduct alleged to have occurred before his suspension was not physically threatening or humiliating.

Under this record, we conclude Ballew failed to raise a genuine issue of material fact on the third and fourth elements of a hostile work environment claim. Accordingly, the trial court erred by denying Parkland's plea to the jurisdiction as to the hostile work environment claim.

## CONCLUSION

Ballew presented no competent evidence to show or even suggest Parkland's legitimate, nondiscriminatory reasons for terminating his employment were pretextual. Further, he presented no evidence supporting his hostile work environment claim. Ballew, thus, failed to meet his burden of proof to waive Parkland's immunity from suit. Accordingly, we reverse the trial court's order denying Parkland's plea to the jurisdiction and render judgment dismissing Ballew's claims against Parkland for lack of subject matter jurisdiction.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
221358F.P05                                   JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

DALLAS COUNTY HOSPITAL
DISTRICT D/B/A PARKLAND
HEALTH AND HOSPITAL
SYSTEM, Appellant

No. 05-22-01358-CV     V.

MICHAEL BALLEW, Appellee

On Appeal from the County Court at
Law No. 1, Dallas County, Texas
Trial Court Cause No. CC-20-04852-
A.
Opinion delivered by Justice Partida-
Kipness. Justices Reichek and
Breedlove participating.

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's order denying Appellant's plea to the jurisdiction and **RENDER** judgment dismissing Appellee Michael Ballew's claims against Appellant for lack of subject matter jurisdiction.

It is **ORDERED** that appellant DALLAS COUNTY HOSPITAL DISTRICT D/B/A PARKLAND HEALTH AND HOSPITAL SYSTEM recover its costs of this appeal from appellee MICHAEL BALLEW.

Judgment entered this 26th day of March 2024.